

**ORDERED in the Southern District of Florida on September 14, 2010.**

A. Jay Cristol, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

In re:

BISCAYNE BAY LOFTS, LLC,

        Debtor.

_____/

Case No.  10-13020-BKC-AJC
Chapter 7

**ORDER (I) APPROVING BIDDING PROCEDURES; (II) APPROVING OF MOTION
FOR SALE OF PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES OTHER THAN REAL ESTATE TAXES;
AND (III) SCHEDULING  AUCTION DATE AND FINAL HEARING ON SALE**

This Matter came before the Court on September 14, 2010 at 2:30 pm. upon the Trustee's

*Motion for (I) Approval of Bidding Procedures; (II) Approval of Motion For Sale of Property*

*Free and Clear of Liens, Claims and Encumbrances Other Than Real Estate Taxes; and (III)*

*Scheduling Final Hearing* (the "Motion")(D.E. # 134). The Court having considered the Motion,

the arguments of counsel and having institutional knowledge of the facts and circumstances of

this case, and being otherwise advised in the premise, makes the following findings of fact and conclusions of law:[1]

1.      The Motion is **GRANTED** in all respects.

2.      Hyperion is owed $22,309,280.23[2] (the "Hyperion Debt") and is entitled to credit bid up to the amount of $12.5 million, and will commence its bidding at $7.0 million.

3.      The 2009 and 2010 property taxes relating to the Hyperion Units remain outstanding.  The total amount due for property taxes is believed to be approximately $486,646 as of August 31, 2010. The outstanding taxes, both real and personal (if any)  will be paid by the Purchaser of the Hyperion Units and the Hyperion Units are therefore being sold subject to such taxes.

4.      As detailed below and in the *Order Granting Trustee's Motion to Approve Settlement Between Chapter 7 Trustee, MK Contractors, LLC, Hyperion Onyx Partners, LLC and Onyx on the Bay Condominium Association, Inc.* (D.E.132) ("Settlement Motion")[3], a true and correct copy of the Settlement Order is annexed hereto and incorporated herein as Exhibit "A", Hyperion has agreed to, and in fact has, advanced certain costs related to maintenance of the viability of the Association during this process and to the marketing of the Property in order to assure that the sale is in fact arms-length, commercially reasonable sale and has agreed to the other benefits set forth below inuring to this Estate as well as the Association Estate and in the

---

[1] Findings of fact shall be construed as conclusions of  law and conclusions of law shall be construed as findings of fact, pursuant to Fed. R. Bankr.P. 7052. *See, Grand Union Co.*, 2000 Bankr. Lexis 1710 (Bankr. N.J. 2000) and *In re American Family Enterprises, Inc.*, 265 B.R. 377 (Bankr. N.J. 2000)

[2] Plus advances, late charges, costs and attorney's fees, and any and all advances for the benefit of the Association by both Hyperion and Corus.

[3] The *Motion to Approve Settlement Between Chapter 7 Trustee, MK Contractors, LLC, Hyperion Onyx Partners, LLC and Onyx on the Bay Condominium Association, Inc.* (D.E. 91) ("Settlement Motion") shall be referred to as the Settlement Agreement.

Settlement Agreement, which shall also be binding on any other Purchaser, as any Purchaser who outbids Hyperion shall also be obligated to perform all of the monetary and non-monetary commitments of Hyperion, without limitation, if it were the successful Purchaser, as set forth below.

     5.     The Purchaser shall take the Hyperion Units subject to all outstanding real estate and personal property taxes and taxes on any associated property rights (if any) and shall be bound to pay such taxes, so that such taxes are no longer a claim against this estate.

     6.     Trustee will seek higher and better bids to acquire the Hyperion Units at an Auction (the "Auction"), to obtain and select the highest and best bid for title to the Hyperion Units and the other assets being sold, as described in the Settlement Order (the "Successful Bid") under the terms and this Order ("Bidding Procedures").

     7.     The Auction of the Hyperion Units and the associated property rights shall be consistent with (i) requirements of section 363 of the Bankruptcy Code, (ii) the sale process under the this Order; and (iii) the terms of the Settlement Order.

     8.     The Auction shall be conducted on **Tuesday, October 5, 2010 at 3:00 p.m**. at the United States Bankruptcy Court for the Southern District of Florida, 1 S.W. First Avenue, Room 1410, Miami, Florida, 33130, with the hearing to approve the sale to be conducted immediately following the conclusion of the Auction. The Trustee shall not be entitled to any compensation or commission for the conduct of the Auction.

     9.     Trustee will solicit "Qualified Bids" from other interested potential purchasers during marketing and due diligence period of between the date of this Order and the Auction Date.

10.    If at least one Qualified Bid is timely received, the Estate's interest in the Hyperion Units will be sold at the Auction described above.

11.    In the event that no qualified competing bid is received by the Trustee within the time frames established herein, the Auction will be cancelled and Hyperion will be declared the Purchaser, and the Trustee and Hyperion will move directly to the Sale Hearing.

12.    At the Sale Hearing immediately following the Auction, the Trustee will establish that he has conducted an appropriate sales effort to expose the Hyperion Units to a comprehensive and competitive sale process.

13.    Hyperion shall provide notice of this Order,[4] the Sale and Auction to all parties in interest, and all known parties that have expressed an interest in acquiring the Hyperion Units from the Trustee since his appointment. The Court finds that the Trustee designed the Bidding Procedures to promote continued, competitive bidding without eliminating or discouraging any qualified bids, subject to the provisions of the Settlement Agreement and the Settlement Order..

14.    The Court finds that the proposed Bidding Procedures constitute the best method and most expeditious method of maximizing the value of the Hyperion Units through a competitive sale process.

15.    Only qualified bidders (the "Qualified Bidders") may submit bids for the Hyperion Units or otherwise participate in the Auction.  Qualified Bidders are those entities who shall (i) have delivered a cashier's check, representing immediately available, good, U.S. funds, made payable to Barry Mukamal, Trustee, or wire transfer in an amount not less than the sum of the Deposit, costs reimbursable to Hyperion and the initial overbid in the total amount of $997,558.11, set forth below (the "Qualified Bidder Deposit") and (ii) have delivered to the

---

[4]  All known Parties-in-Interest to the Association case and the instant case have been provided with the Settlement Motion and the Order approving same.

Trustee the potential bidder's most recent audited financial statements, or in the case of a potential bidder formed for the purpose of acquiring the Lease, current financial statements of the equity holder(s) of the potential bidder, or in any case such other financial disclosure, reasonably acceptable to the Trustee, which information shall demonstrate the financial capability of the potential bidder to purchase the Hyperion Units should the potential bidder be the Successful Bidder. The Trustee's determination of the qualifications of the potential bidders shall be conclusive. The required Qualified Bidder Deposit shall be in the amount of $250,000,[5] plus the additional amounts set forth in Paragraph 19, *infra*.

16.    The Qualified Bid must include an affirmative acknowledgement that the potential bidder will be bound by all of the obligations of the Purchaser under the Settlement Agreement and the Order, without limitation, and that such potential bidder has read and understands such obligations. The competing bid must provide within its contemplation, the Qualified Bidder Deposit, which includes the initial overbid amount, plus the Hyperion Reimbursements described in Paragraph 19 below and the first incremental bid, also described below (the "Initial Overbid"). Any Qualified Bid over the Initial Overbid shall be considered in minimum $250,000 increments. The competing bid cannot in any means be conditioned on the ability of the competing bidder to obtain financing or the outcome of unperformed due diligence by such bidder.   Notwithstanding anything herein, each competing bid must specifically acknowledge the obligation to close on the transaction within 10 days of the entry of the Order approving the sale, or such shorter time as the Court may approve.   The Competing Bid must be accompanied by a letter affirmatively (i) setting forth the identity of the bidder and the contact information for such bidder and full disclosure of any affiliates or insiders of the Debtor involved

---

[5] Hyperion shall be considered a Qualified Bidder without the need to post a deposit, in light of its established credit bid rights.

in such bid, (ii) stating that the bidder specifically agrees to purchase the Hyperion Units upon the express obligations, terms and conditions set forth herein and in the Settlement Order, without exception, (iii) summarizing the proposed consideration the bidder proposes to pay under the competing bid, (iv) stating the form of the Qualified Bidder Deposit (i.e. cashier's check or wire transfer) made by the bidder, (v) further providing that such offer shall be binding and irrevocable in the event that the competing bidder is in fact the Purchaser, and (vi) acknowledging the obligation to be a back up bidder in accordance with the provisions hereof in the event that it is the second highest bidder and the Purchaser does not close in accordance with these procedures. The Notice Parties, set forth below must receive the foregoing materials on or before 4:00 p.m., no less than five (5) business days prior to the Auction (the "Initial Bid Deadline"). As used herein, Notice Parties means:

If to the Trustee:

> Barry Mukamal, Trustee
> Marcum Rachlin
> 1 S.E. Third Avenue; 10th Floor
> Miami, FL 33131
> Fax No: 305.377.8331
> Email:barry.mukamal@marcumrachlin.com

With copy to:

> Lawrence A. Gordich, Esquire
> Segall Gordich, P.A.
> 801 Brickell Avenue Suite #900
> Miami, Florida 33131
> Fax No: 786.375.5095
> Email: LAG@segallgordich.com

If to Hyperion:

> Hyperion Onyx Partners, LLC
> Attn: Scott Bloom
> 888 Biscayne Blvd., Lobby
> Miami, FL 33122
> E-Mail: sbloom@hypdev.com

With copy to:

James H. Fierberg, Esquire
Akerman Senterfitt
One S.E. 3rd Ave., 25th Floor
Miami, Florida  33131
Fax No: 305.982-5679
E-Mail: james.fierberg@akerman.com

With additional copy to:

Michael I. Goldberg, Esquire
Akerman Senterfitt
Las Olas Centre II – Suite 1600
350 East Las Olas Blvd.
Fort Lauderdale, Florida 33301
Fax No: 954.463.2224
E-Mail: Michael.goldberg@akerman.com

If to MK Contractors, LLC:

Henry Marinello, Esq.
Marinello & Kotzen, P.A.
14361 Commerce Way; Suite 304
Miami Lakes, FL 33016
Fax No: 305.821.5054
E-Mail: hmarinello@makslaw.com

With copy to:

Jerry Markowitz, Esquire
Markowitz Davis Ringel & Trusty, P.A.
Two Datran Center, Suite 1225
9130 South Dadeland Blvd.
Miami, Florida  33156
Fax No: 305.670.5011
E-Mail: JMarkowitz@mdrtlaw.com

If to Association:

Onyx On The Bay Condominium Association
Attn: Norman Wartman, President
665 NE 25th Street Ste# 100
Miami, Fl 33137
Fax: 786.364.3401
E-Mail: normanwartman@gmail.com

With copy to:

Jeffrey Blacher, Esquire
2999 N.E. 191st Street, Suite 805
Aventura, Florida  33180

{M2969091;1}                                        7

Fax No: 305.356.3693
E-Mail: jblacher@blacherlaw.com

17.    Within three (3) business days of each potential bidders' delivery of all of the materials in the immediately preceding paragraphs, Trustee will notify such potential bidder in writing as to whether such potential bidder shall be considered a Qualified Bidder.

18.    If the Trustee receives a Qualified Bid by the Initial Bid Deadline, along with a conforming deposit, and the Auction is actually commenced, bidding at the Auction will commence with the highest Qualified Bid and will thereafter continue in increments of not less than $250,000 until all parties have made their final offers. The Auction shall be subject to a reduction in the bidding increments, at such time as the Trustee (or in the event that this Court conducts the Auction, the Court) believes such adjustment will enhance the continued interest in bidding on the Hyperion Units.  At the conclusion of the Auction, a Sale Hearing will be conducted by the Court to review and consider the bids. At the hearing, the Trustee will recommend the highest and best offer for the Hyperion Units and the Court shall then determine, in its sole discretion, which of the Qualified Bid(s) constitutes the highest and best offer for the Lease and which of the Qualified Bids constitutes the second highest and best bid for the Hyperion Units. The bidder making the bid that is selected as the highest or best bid by the Court or any bid that is ultimately selected by the Court in accordance with the Bidding Procedures, shall be considered the "Successful Bidder" or the Purchaser under the Settlement Order and the bidder that is selected as the second highest and best bid by the Court shall be considered the "Second Highest Bidder." The Court and/or the Trustee, as may be the case, will inform each of the bidders of the decision regarding who will be the Successful Bidder and the Second Highest Bidder.  The Qualified Bidder Deposit of the Successful Bidder shall be considered the "Successful Bidder Deposit." The Second Highest Bidder shall be obligated to close at his/her/its

last bid amount in the event that the Successful Bidder defaults and the Trustee shall be entitled to maintain the deposit tendered by the Second Highest Bidder until such time as the closing with the Highest Bidder occurs. Such closing shall be within 10 days of this Court's approval of the sale, unless the Court orders otherwise. In the event the party that is confirmed by the Court as the Purchaser shall fail to close on the transaction within the time-frames set forth herein, the Successful Bidder Deposit, in the amount of $250,000.00, shall be forfeited to the Trustee as liquidated damages and the Hyperion Units shall be sold to the Second Highest Bidder.

19.    As set forth in the Settlement Order, there are many obligations that the Purchaser will be required to perform as part of its successful bid. In addition to those obligations, there are some initial monetary obligations that the successful bidder will need to include in the initial overbid. They are as follows:

a.    Reimbursement to Hyperion for the $2,500 (or such additional amounts as may be agreed to by Hyperion)  in advertising costs advanced in respect of the sale under par. (b)(3) of the Settlement Agreement;

b.    Reimbursement to Hyperion of all sums advanced to the Association for operating expenses in the amount of $277,972.94,[6] as of August 31, 2010, plus other expenses funded through to the date of the Sale, and $117,114.17, in advances by Corus under par (4) (n) of the Settlement Agreement;

c.    $250,000 to the Trustee to be held for the administrative carve out for the estate under par. (4)(q) of the Settlement Agreement;

d.    $100,000 to be held in escrow by the Trustee to fund the indemnification obligations under par. (4)(ee) of the Settlement Agreement.[7]

---

[6] This figure may increase prior to the auction and will be updated at that time.

[7] Potential bidders are strongly cautioned to review the Settlement Agreement and this Order in detail to understand the further monetary obligations  (i.e., funding of Association Plan ($200,000.00) and funding of MK Settlement (initially $425,000 but as high as $500,000 plus collection costs) among others) and the numerous non-monetary obligations that run with the transfer of title to the Hyperion Units to the Purchaser. A copy of the Settlement Order is annexed hereto as Exhibit "A" and the Settlement Agreement can be located on PACER as document entry #91.

20.    Thus, the initial overbid, must be in the amount of at least $250,000 (initial overbid), plus the items set forth in sub-paragraphs a-d, set forth immediately above and the required deposit, or a total of $997,558.11, plus a commitment to pay any additional sums advanced by Hyperion to the date of the Auction, which amounts will be provided just prior to the start of the Auction.

21.    In the event Hyperion is not the successful bidder, Hyperion shall be entitled to forthwith receive the sale proceeds, net of the administrative carve out and the indemnification amount at the closing of the sale, which shall be paid by the successful Purchaser.

22.    The sale of the Hyperion Units shall be conditioned upon an express finding by the Court that the Purchaser is a good faith purchaser for value and that the transaction is arms-length, and as such, the Purchaser is entitled to the protections of §363(m) in respect of the Sale Order contemplated herein. *See, generally, In re Rare Earth Minerals*, 445 F. 3d 359 (4th Cir. 2006) and *In re Adamson Company*, 159 F. 3d 896 (4th Cir. 1998).

23.    The Hyperion Units will be sold **"AS IS, WHERE IS AND HOW IS,"** with no representations, recourse nor warranties of any type being given by the Trustee or any other party.

24.    The successful bidder shall be responsible for the payment of all fees, costs and taxes arising from or related to the transfer of the Estate's right, title and interest in the Property to the successful bidder, including recording fees, document stamps and the like.

25.    The Trustee shall advertise the sale of the Hyperion Units in a commercially reasonable manner and publish the Auction Sale to the local market where the Property is situated. However, the Trustee must do so without exceeding the sum of $2,500.00 which

Hyperion has agreed to advance, unless in its sole discretion, Hyperion elects to increase the advertising budget.

26.     Hyperion will serve copies of this Order together with the Notice of Auction as required by Rules 6004, 2002(a)(1) and 2002(a)(2) of the Federal Rules of Bankruptcy Procedure.

27.     The Sale Hearing to consider the relief requested in the Sale Motion and, if the Auction is conducted, to consider whether to approve the Successful Bidder(s) (the "Sale Hearing") will be conducted on **Tuesday, October 5, 2010**, immediately following the conclusion of the Auction.

28.     The Court authorizes the closing on the sale of the Property immediately upon Court approval, with a waiver of the 14 day stay period provided in Fed. Bank. P. 6004 (h). In any event, the Purchaser (other than Hyperion to the extent of its credit bid) will be required to pay the purchase price, in immediately available, good U.S. funds, within ten (10) business days of entry of a final non-appealable order approving the sale of the Property to the successful bidder of the Auction Sale (the "Final Sale Order"), unless the Trustee and the Purchaser agree to an earlier closing date.  If the successful bidder fails to timely close, the Property will be sold to Second Highest Bidder (the "Back-up Bidder").  The Back-up Bidder shall similarly be required to close within ten (10) business days after notification that the successful bidder has failed to close, or such earlier time as may be agreed to by the Trustee and the Back Up Bidder.

29.     Trustee shall take all steps necessary to convey the Estate's right, title and interest in the Property, free and clear of any and all liens, claims, interests and encumbrances, other than the Tax Collector Claims, within ten (10) business days of entry of the Final Sale Order, unless an earlier date is agreed to between the Purchaser and the Trustee. However, all closing

documents, including without limitation, the deed(s) bills of sale, etc., shall be provided by counsel for the successful Purchaser and shall be prepared in accordance with applicable rules both the Local Rules for the United States Bankruptcy Court for the Southern District of Florida and the Federal Rules of Bankruptcy Procedure, and shall be subject to the Trustee's reasonable review.

#  #  #

Copy to James H. Fierberg, Esq.

Attorney Fierberg is directed to serve a copy of this Order on all parties in interest in accordance with the Rules of this Court, including any and all parties who have made their interest in acquiring the Property known to the Trustee or any other person who has communicated such interest and has communicated such interest to the Trustee, and to file a certificate of service in respect of same with this Court.

EXHIBIT
"A"



**ORDERED in the Southern District of Florida on August 23, 2010.**

A. Jay Cristol, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

In re:                                                          Case No.  10-13020-BKC-AJC
                                                                Chapter 7
BISCAYNE BAY LOFTS, LLC,

_____Debtor._____/
CORUS BANK, N.A., a National Banking Association,

                   Plaintiff,                                   Adv. Pro. No. 10-02724-AJC

v.

BISCAYNE BAY LOFTS, LLC, a limited liability                    State Court Case No. 09-34794 CA32
company; WILLY A. BERMELLO, an individual;
GUSTAVO MICULITZKI, an individual; ONYX
ON THE BAY CONDOMINIUM ASSOCIATION, INC.,
a Florida Not-For-Profit corporation; and
MK CONTRACTORS, LLC,  a Florida limited liability
company,

_____Defendants._____/
MK CONTRACTORS, LLC,  a Florida limited liability
company,

                   Counter-Plaintiff,

v.

CORUS BANK, N.A., a National Banking Association;
HYPERION ONYX PARTNERS, LLC, a Florida
limited liability company,

_____Counter-Defendants._____/

## ORDER GRANTING TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT BETWEEN CHAPTER 7 TRUSTEE, MK DEVELOPERS, LLC, HYPERION ONYX PARTNERS, LLC AND THE CHAPTER 11 ESTATE OF ONXY ON THE BAY CONDOMINIUM ASSOCIATION, INC.

This matter came before the Court on August 17, 2010 and was also heard at a continued

hearing on August 19, 2010, upon the *Trustee's Motion to Approve Settlement Agreement*

*Between Chapter 7 Trustee, MK Contractors, LLC, Hyperion Onyx Partners, LLC and the*

*Chapter 11 Estate of Onyx on the Bay Condominium Association, Inc.* (the "Motion")(D.E.# 91).

The Court has considered the objections to the Motion, the argument of counsel and finding that

the approval of the Settlement Agreement is in the best interest of the estates of both the Debtor

and the Association ("the Estates"),[1] makes the following findings of fact and conclusions of

law.[2]

1.    The Court has heard and considered all objections to the Agreement and to the

extent they have not been withdrawn, all such objections are overruled.

2.    The Court finds, that after consideration of the testimony of the witnesses, whose

testimony the Court deems to have been truthful and credible, the Agreement, in its entirety, is in

the best interests of the Estates.

3.    The Court finds that the Settlement Agreement is fair and equitable in all respects

under the circumstances of this case.

_____

[1] Defined terms used in this Order shall have the same meaning as set forth in the Settlement Agreement.

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, pursuant to Fed. R. Bankr.P. 7052. *See, Grand Union Co.*, 2000 Bankr. Lexis 1710 (Bankr. N.J. 2000) and *In re American Family Enterprises, Inc.*, 265 B.R. 377 (Bankr. N.J. 2000)

{M2956484;3}                                2

4.     The Court adopts and specifically incorporates the following provisions into this Order:

a.     It is axiomatic, that from the first day of the Association filing and the entry of the Order for Relief in the instant case, that the primary focus of each case was to get the Project completed. This will take enormous energy, commitment and cost on the part of Hyperion or the Purchaser. It makes little sense to undertake this fundamental task, the driver of both of these cases, only to have Hyperion or the Purchaser, MK and the Trustee saddled with the responsibility to defend numerous pending or potential actions arising out of the actions taken by others who preceded the parties to the Agreement.

b.     Bar Orders and Channeling Injunctions are frequently used tools to assure that the efforts of the parties who are undertaking important tasks to carry out the purposes of a bankruptcy case are properly protected from having to divert their attention from the important task at hand to expend the time and expense needed to defend such actions. See generally, *In re Munford*, 97 F.3d 449 (11th Cir. 1996), *In re Gas and Oil Litigation*, 967 F. 2d 489 (11th Cir. 1992), *In re Grau*, 267 B.R. 896 (Bankr. S.D. Fla. 2001) (Hyman, B.J.) and *In re S & I Investments*, 421 B.R. 570 (Bankr. S.D. Fla. 2009) (Ray, B.J.); *In re Sentinel Funds, Inc., et al*, Case No. 06-11822-BKR-JKO, (D.E. 367) (Olson, B.J.)(unpublished) and *In re Royal WestProperties, Inc.*, Case No 09-20334-BKR-RAM_(D.E.438) (Mark, B.J.) (unpublished).

c.     In light of the critical, substantial, undertakings required to finish the Project and rescue the Association, now with members of 78 families hanging on to their day to day existence because they bought condominium units from the developer Debtor while it was operated and controlled by some of the very same persons objecting to the settlement, both of which have been stated to be prime concerns of this Court, utilization of Section 105(a) of the Bankruptcy Code to implement and enforce the requested Channeling Injunction and Bar Order

is both necessary and appropriate. The Court finds good, proper and just cause for the entry of the Bar Order and Channeling Injunction ("collectively the "Bar Order") set forth in the Agreement, including, without limitation channeling all possible claims and causes of action against the Trustee, MK, Hyperion or any other Purchaser into the estates of the Debtor or the Association's estate and both barring and enjoining all claims in the Debtor's Estate as well as the Association's Estate against the Trustee, MK and Hyperion, or any other Purchaser including, without limitation, a Bar Order against BAP and the Guarantors ("Third Party Claimants"), arising out of the facts, conduct, transactions and circumstances related to the Project, or the alleged actions of Corus in respect to proper funding or other related claims, including those claims set forth in the Removed Actions, except for such claims specifically excluded within the Agreement, which is incorporated herein by reference in its entirety.

      d.      The Court finds that the Trustee has undertaken good and sufficient efforts to send notice out to all parties in interest in the Estates of the request for the Bar Order entered pursuant to this Order.

      e.      The Court acknowledges and approves the validity, priority and extent of Hyperion's lien up to the amount of $22,309,280.23[3] and Hyperion's right to credit bid up to the amount of $12,500,000[4] for the Hyperion Units, per Hyperion's agreement.

      f.      The Bar Order shall be effective *nunc pro tunc* to the date of the filing of the 9019 Motion to approve the Agreement..

---

[3]

   Plus advances, late charges, costs and attorney's fees, and any and all advances for the benefit of the Association by both Hyperion and Corus.

[4]

   Nothing in this Order shall obligate Hyperion to bid the full amount of its allowed credit bid. In addition, the property to be offered at the Sale and which is subject of the credit bid shall include the Hyperion Units, all personal property and Buyer Escrow Accounts being held by the Debtor.

g.     Within 10 days of the entry of this Order, the Trustee shall file both a Motion to Establish Bid Procedures ("Bid Procedures"), a Sale Motion and a proposed auction date with respect to the Hyperion Units. The Bid Procedures shall not include the retention of an auctioneer, rather, the Trustee shall conduct the sale consistent with the terms of the Bid Procedures, provided however that under no circumstances shall the Trustee be entitled to a commission in respect of the Auction. Hyperion shall be responsible for the reasonable advertising costs to assure that the sale is commercially reasonable, not to exceed $2,500.

h.     The Trustee shall hold a Bankruptcy Auction Sale in open court and then a closing as soon as practicable thereafter at which actions (i), (ii), (iii) and (iv) described below shall occur, and shall be deemed to occur simultaneously, with each action conditioned upon the completion of the other, with all required documents to be prepared by Hyperion's counsel and subject to Trustee's reasonable review.

i.     The Trustee shall transfer to the successful purchaser at the sale (the "Purchaser"), through a transaction under section 363 of the Bankruptcy Code, including, among other things, the protections provided under section 363(m) and a waiver of the 14 day stay provided in Fed. R. Bankr. P 6004 (h), free and clear of all liens, claims, interests and encumbrances, save and except for all real and personal taxes thereon, pursuant to a usual and customary form of Trustee's Deed, title to all of the personal property described herein that is located at the Project and title to the following units[5]:

---

[5]

The term "units" shall include the following:

(i)     all limited common elements;

(ii)    all personal property located in the units (including but not limited to appliances and fixtures);

(iii)   56 unassigned/unsold parking spaces for the units which the Purchaser may freely assign, provide that there shall be no cost to the Association. (see Exhibit "A" to Motion)

(iv)    the unassigned/unsold 15 storage spaces for the Units (see Exhibit "B" to Motion);

(v)     The Association has leased Unit 70. A copy of the lease agreement is attached to the Motion as Exhibit "C". The HOA shall assign to the Purchaser the Lease including the security

(i)     205, 206, 306, 406, 505, 506, 603, 604, 605, 606, 706, 803, 901,1001, 1101, 1201, 1205, 1401, 1405, 1505, 1701, 1705, 1801, 1805, 1905, 2001, 2005, 2101, 2102, 2105, 2201, 2205, 2401, 2501, 2601, 2605, PHI3, PHI4, PHII1, PHII2 (the "Hyperion Units"), See Footnote 1, *supra.*;

(ii)    Personal property referenced in the immediately preceding paragraph shall include, without limitation, all buyer escrow accounts related to the Hyperion Units, unless otherwise ordered by this Court;

(iii)   The Purchaser and/or its assigns shall commence making the condominium Association payments on the "Hyperion Units" upon receiving full, legal title and possession of the Hyperion Units, subject to the provisions set forth, below; and

(iv)    On or before 90 days of the Purchaser and/or its assigns reinstating the TCO on the Project, as discussed below, the Purchaser shall pay to MK the sum of $425,000 in cash, which is unconditional and shall not be subject to set off for claims of any kind whatsoever.  In the event that the Purchaser fails to timely make all or part of this payment to MK, MK shall be entitled to payment of the sum of $500,000,[6] plus all reasonable fees, costs inclusive of any costs of collection, appellate fees and/or bankruptcy fees and expenses, and a first lien on 20 of the Hyperion Units, which units Hyperion agrees shall not be otherwise

---

deposit and subsequent rent proceeds, if any.

[6]  For purposes of clarity, in the event of a default under this paragraph, it is agreed and understood that MK shall not be entitled to *both* the $425,000 *and* the $500,000, but rather, just the difference between such amounts (i.e. $75,000), plus costs of enforcement, as described above. In the event that the Association has any claim(s) against MK's CCL Policy for any work performed, the Association recognizes that the $75,000.00 referenced herein shall serve as a partial satisfaction of any such claims(s).

liened or encumbered provided that such Units are not the same units Hyperion intends to use to procure a secured construction loan, and which units will be agreed upon by and between Hyperion and MK ("Designated Units"). In addition, in the event that MK is not paid, as provided for herein, the Purchaser shall be obligated to (i) waive all defenses to payment of the MK obligation or to the enforcement of the liens; (ii) agree not to encumber any of the Designated Units; and (iii) shall not transfer any of the Designated Units without the prior consent of MK. This Court retains jurisdiction to enforce the obligations on the Purchaser to provide the referenced lien. The Purchaser will cooperate and execute all documents reasonably necessary to effectuate the lien on the designated units. In order to effectuate this provision, MK and the Purchaser shall agree on the designated units and Hyperion shall execute a deed in escrow, to be held by a neutral third-party escrow agent, under specific escrow release provisions to be established between the Purchaser and MK. In the event MK and the Purchaser cannot come to terms as to which Units shall be subject of the MK lien, this Court will make such determination.

j.      Immediately on the conclusion of the sale of the Hyperion Units, MK shall cause to be removed any of its existing statutory liens against the Hyperion Units, including but not limited to delivery of duly executed and recordable lien satisfactions and releases of any *lis pendens.*

k.      Notwithstanding anything to the contrary in this Order. the Association and the Purchaser shall retain all claims against MK and its CGL Insurance policy or any other party for latent defects at the Project.. Notwithstanding the releases provided for in

the Agreement and approved in this Order, to the extent any claims are asserted or made against MK or the CGL policy, all defenses and/or counterclaims MK may possess shall be preserved as an offset for such claims, including those claims for non-performance under the Construction Agreement.

l.      If not already produced, MK shall immediately deliver to Hyperion the RC Aluminum punch list, and shall make a good faith effort to assist the Purchaser to have those subcontractors previously retained by MK, whom the Purchaser desires to return to the Project to perform work under a new contract or agreement with the Purchaser.

m.      The Purchaser, the Association and the Trustee on behalf of the Debtor, shall release MK from any and all claims against the Travelers Performance Bonds.

n.      All CGL Insurance Policies insuring MK and any subcontractors shall remain effective pursuant to the terms of each policy and limited to work performed by MK and the respective subcontractors under the original terms of their contracts to cover all claims made against MK and subcontractors for latent defects.

o.      The Trustee, Association and the Purchaser shall retain claims against all other third parties (excluding MK) and their performance bond(s), if any, including, but not limited to, claims for latent defects, remediation work, claims related to the removal, destruction or damage caused to the Hyperion Units by third parties, to service the 78 units previously conveyed, claims for work performed by subcontractors contracted for work to be performed by the Debtor pursuant to the Exhibit A to the Construction Contract (not an exhibit to the Motion or this Order) and any and all other claims related to work performed on the Project.

{M2956484;3}                                              8

p.      MK shall remain responsible for only those lower tier subcontractor and/or vendor claims or liens that are pending whether against the Travelers Payment Bond or otherwise, related to the Project, and shall indemnify and hold harmless the Purchaser and the Trustee for all such claims or liens.  The Trustee, Purchaser and Association shall waive and release any claims against the Travelers Payment or Performance Bonds. MK shall have no responsibility or liability for any subcontractors retained by the Debtor for work to be performed pursuant to Exhibit A to the Construction Contract, or any other subcontractor retained by or on behalf of the Debtor.

q.      It is ordered that MK shall have no liability or claims asserted against it for the actions of the Debtor and/or third parties who removed, destroyed or caused damage to the Hyperion Units after the original TCO was obtained.

r.      MK shall make its best efforts to obtain a release for the benefit of the Purchaser and the Trustee for those subcontractor claims against the Travelers Payment or Performance Bonds. Payment to MK by the Purchaser, as described above, satisfies MK's alleged claim against Hyperion but is not deemed payment in full of the amounts owed pursuant to the Construction Contract between MK and the Debtor.

s.      The Purchaser shall pay to the Association's Estate the sum of $200,000 to expressly be used to fund the Association's Plan of Reorganization and satisfy any other obligations the Trustee and/or the Developer may have to the Association. Under no circumstances shall the Purchaser be obligated to further fund any aspect of the Association Plan. Any further cash requirements for the plan will come from assessments or other assets of the Association bankruptcy estate. In the event of a special assessment, Hyperion will be entitled to a $200,000 credit against any assessment of its units, if it is

the Purchaser. This plan funding payment shall not be due and payable until the later of 60 days following the issuance of the new TCO or date of the submission of the confirmation affidavit in advance of the confirmation hearing on any such plan.

    t.    The Court finds that the Plan funding payment to the Association, described above, constitutes full, good and valuable consideration for the full, final and irrevocable release of any and all claims against or obligations of the Purchaser and the Trustee to the Association under the Bar Order (other than forward-going assessment obligations as set forth in this Order) and/or the Trustee including, without limitation, turnover, audits, funding of reserves as well as a waiver of all statutory rights which the Association has or could assert against the Purchaser or the Trustee.  Under no circumstances shall the Purchaser or the Trustee be obligated to fund any audits associated with the Association.

    u.    The Court finds that Hyperion has funded $195,959.15,[7] for Association expenses since the commencement of this case for which Hyperion (assuming it is the Purchaser) is entitled  to a set off against future Association assessments, or alternatively, in the discretion of Hyperion, it may be a component of the overbid requirement in the bid procedures.

    v.    Hyperion or the Purchaser's (which ever the case may be) set off credits shall be applied at the rate of up to $10,000 per month until the set off right is exhausted which set off right shall commence 90 days after Purchaser obtains full legal title and possession of the Hyperion Units.

---

[7]    Plus any additional Association expenses that Hyperion elects to fund.

w.    The Court finds that Corus had also funded $117,114.17 in Association expenses prior to Hyperion acquiring the loan. In the event that Hyperion is the Purchaser, Hyperion shall have the right to offset its advances as well as the advances by Corus up to the amount of $360,000. In the event that total advances of Hyperion and Corus exceed $360,000, then any overages beyond the $360,000 figure entitled to be applied as credits shall be reduced to the amount of the pro rata distribution to general unsecured creditors under the confirmed HOA Plan.

x.    The Court finds that Purchaser's Plan funding payment of $200,000 to the Association, also constitutes full, good and valuable consideration for a complete release by the Association and its unit owners of Hyperion, any other Purchaser and the Trustee for any claims of any kind or nature by the Association, or the unit owners, including, without limitation any claims that the Purchaser, MK or the Trustee is or was a successor developer, as well as consideration for the Bar Order.

y.    In the event the Purchaser does not perform and complete the construction on the Project, the release by the Association of the Purchaser shall be void.

z.    All of the assessment credits described in the forgoing paragraphs may be transferred to individual unit purchasers from Hyperion subsequent to Hyperion taking title and those end purchasers shall be entitled to use their pro-rata share of the assessment credits allocable to their units. If Hyperion is not the Purchaser, it shall nevertheless be entitled to sell the condominium assessment credits that have accumulated to the Purchaser.

aa.    In respect of the Association, in the event that Hyperion is the Purchaser, the Association agrees that Purchaser shall have the following rights:

{M2956484;3}                                11

1.      To use the Hyperion Units for model apartments and to show same to prospective purchasers and tenants.

2.      To use the Hyperion Units for sales, leasing, residence management and construction offices and to use the office adjacent to the current property manager's office, which is a portion of the Common Elements (the "Hyperion Office"), for sales, leasing, and residence management offices, to use the storage units located in the operational and non-residential areas of the first (S level) and second floors for construction purposes.

3.      To display signs on the Hyperion Office and the Common Elements to advertise the Hyperion Units for sale or lease, subject to reasonable requirements of the Association as to the size and number of signs.

4.      To make alterations, additions or improvements to the Hyperion Units; to change the layout or number of rooms in the Hyperion Units; to combine or separate Hyperion Units into a combined unit or distinct units; and to reapportion among the affected Hyperion Units their interests in the Common Elements, Common Surplus and Common Expense (all as defined in the Condominium Documents). Such changes shall not require Association approval, but shall comply with applicable governmental requirements, if any. At Purchaser's request and expense, the Association shall amend the Condominium Documents to reflect that Units 603 and 604 have been combined and constitute a single unit.

5.      To install hard surfaced floor coverings in the Hyperion Units in a manner so as to reasonably limit sound transmission. Such installation shall not

require Association approval, but shall comply with applicable governmental requirements, if any.

6.    Any Association right of first refusal shall not apply to Hyperion Units sold by or to Purchaser and Purchaser shall have the right to sell the Hyperion Units without having to first offer same for sale to the Association. The Association shall provide to Purchaser concurrent with delivery to Purchaser of the deed to the Hyperion Units a certificate in recordable form executed and acknowledged by an officer of the Association stating that the right of first refusal has been waived by the Association and such rights have terminated. Further, with respect to the units in the Condominium other than the Hyperion Units, the Association shall assign to Purchaser the Association's right of first refusal concurrent with the delivery of the deed to Purchaser.

7.    The Association shall be responsible for all aspects of transfer of Association control to unit owners in accordance with FS 718.301. Neither the Trustee nor the Purchaser shall have any responsibility therefor, except to execute any documents required by law to accomplish the transfer.

8.    Any permitted use by Purchaser or Purchaser's affiliate of the Common Elements hereunder shall be without charge to Purchaser or Purchaser's affiliate.

9.    The Association shall take such action and execute such documents as are reasonably necessary or desirable to effectuate the terms of this section (o). This section (o) shall survive the conveyance of the Hyperion Units to Purchaser until such time as Purchaser is no longer the owner of any Hyperion

{M2956484;3}                                13

Unit or Purchaser or Purchaser's affiliated entity is no longer the residence manager of any Hyperion Unit, whichever is later.

10.    For 36 months following approval of this Agreement, the Association shall have the right to make and assess for physical changes to the building that would either increase revenue or decrease costs by simple majority vote of the Board of Directors, rather than a vote of the ownership, but such changes shall comply with applicable governmental requirements, if any.

bb.    Hyperion (or the Purchaser) shall have a seat on the Board (upon gaining title to the Hyperion Units), limited to 5 years..

cc.    Hyperion and the Trustee agree that the following list of tasks constitute an estimated and non-binding scope of work to be performed by the Trustee and his counsel in order to complete the sale contemplated herein:  (i) review of Hyperion's preparation and prosecution of a motion to approve bid procedures for the auction of the Hyperion Units and the prosecution thereof; (ii) review of Hyperion's motion for the auction the Hyperion Units pursuant to section 363 of the Bankruptcy Code and prosecution thereof, containing the protections of section 363(m), with Hyperion being allowed a credit bid, as set forth above, and containing a waiver of the 14 day stay provided under FRBP 6004(h); (iii) conduct of the sale; (iv) attend all hearings in the case related to the transactions contemplated in this Order; and (vi) such other tasks as are reasonably necessary to carry out the spirit and intent of this Order.

dd.    Notwithstanding that the foregoing scope of work is non-binding, under no circumstances shall any of the fee "carve-out" described below be used to fund any efforts by the Trustee to (i) investigate and prosecute Chapter 5 avoidance actions; (ii)

investigate and prosecute any claims objections; or (iii) further investigate or prosecute any proceedings in respect of the Hyperion Lien.

ee.    The fees of the Trustee and his professionals shall be subject to Court approval as to reasonableness and Hyperion shall retain its right to object to such fees on the basis of reasonableness of individual time entries. The Court has been advised that Hyperion has posted the sum of $250,000 to the trust account of Akerman Senterfitt as a full and final payment of the $250,000 fee "carve-out" described below.

ff.    Upon transfer of title to the Hyperion Units, the escrow will be released to the Trustee's trust account. In the event that Hyperion is not the Purchaser, the Purchaser shall, upon the closing of the Auction, post the $250,000 described above and any interest of the estate or the Trustee in the Hyperion "carve-out" shall be null and void and the escrow shall immediately be released to Hyperion.

gg.    In no event are Hyperion or the Purchaser required to fund in excess of $250,000 for the Trustee and his Professionals. The "fee carve-out" shall only cover fees through the closing on the sale of the Hyperion Units. Any amounts not utilized through approval of fee applications shall, remain available for the payment of allowed administrative expenses in the present Chapter 7 case.

hh.    The Court recognizes that under the Agreement it is a condition precedent to the obligation of Hyperion or the Purchaser to make the payment under the Agreement to MK, the Association or the Trustee that this Order specifically include all elements of this Agreement, including, without limitation, the Bar Orders and indemnities (described below) and elsewhere in the Agreement, including allowance of disbursement of the above referenced fees to the Trustee, his Professionals (following the filing of

{M2956484;3}                                    15

applications to the Court and approval thereof, subject to the rights of Hyperion or anyone else to object, as provided above), in this Order, and the Court so orders.

ii      The Trustee retains all rights to seek any appropriate surcharge against Hyperion pursuant to 11 U.S.C. Section 506(c), in the event that Hyperion is not the successful Purchaser, subject to Hyperion's right to object to the assessment of such surcharge and its appellate rights with respect to any such surcharge.

jj.      Without waiving any of its absolute right to object to fees of the Trustee and his Professionals on an entry by entry basis, the Court has been advised that Hyperion has undertaken a preliminary review of the fees incurred by the Trustee and his Professionals and finds the amounts asserted to be within the range of reasonableness.

kk.      As part of its obligations under this Order, the Purchaser shall obtain the Temporary Certificate of Occupancy ("TCO") and the Certificate of Occupancy ("CO"), as soon as is reasonably possible. The Purchaser shall be required to fund and perform only the work it deems reasonable and necessary in its sole discretion, whether in the common areas or elsewhere in the Project, in order for the Project to obtain a TCO and ultimately a CO at the earliest practicable date, provided that, the Purchaser shall obtain municipal approval at its own expense.

ll.      The Association and the Purchaser are ordered to meet at least once a month to review the progress of the efforts to obtain the TCO and the CO. The Purchaser shall have the sole authority to select the contractors and subcontractors who will perform the work in respect of the acquisition of the TCO and the CO. The Association shall not make any construction related decisions without the approval of the Purchaser.

mm.      Nothing in this Order is intended to infer, imply or suggest in any way that

{M2956484;3}                                    16

Purchaser or the Trustee is a successor developer. In fact, the Court finds the opposite, that they are not successor developers.

nn.    The obligations of the Purchaser in respect of the acquisition of the TCO and the CO hereunder shall constitute further good, valuable and sufficient consideration for the Bar Order that has been approved above. The Court retains jurisdiction to enforce the obligations of the Purchaser to obtain the TCO and the CO, and the Association is entitled to monitor the progress thereon.

oo.    The Association and MK are directed to fully cooperate with Purchaser to reinstate the TCO on the Project.  Further, MK is further directed, without any cost to MK, to assist the Purchaser in its efforts to obtain the TCO and the CO, including but not limited to transferring the Master Permit to the Purchaser or Purchaser's designees and any other necessary documentation, at the Purchaser's expense.

pp.    The Association is directed to provide the Purchaser and MK (in the case of MK solely for the extent requested by the Association or the Purchaser) with any and all necessary access to the Project to allow the Purchaser to perform any and all necessary inspection or repairs of the Units; during normal business hours.

qq.    The Court has been advised that MK has already provided documents with the exception of the waterproofing and roofing to Continental Management pursuant to prior instructions from the Debtor.  MK is directed to use its best efforts to obtain and forthwith provide the waterproofing and roofing close out documents, but shall not be held liable in the event they are unsuccessful. The Court has been advised that to the best of the Parties knowledge, there are no other close-out documents in MK's possession.

rr.    MK is directed to cooperate with the Parties in the turn-over of the Project

to the unit owner controlled association (including providing any applicable documents needed for the turn-over package without any cost to MK and at the Purchaser's expense, (to the extent that MK maintains custody or control over same) at the earliest practicable date in accordance with Fla. Stat. Sect. 718.316 (the "Condominium Act"). To the extent applicable and enforceable under Florida Law, the entry of this Order and the sale of the Hyperion Units shall constitute a turnover of the Project to the unit owner controlled association. In the absence of that, the Association is directed to take full responsibility for meeting the obligations of Florida Statutes Section 718 to assure turnover.

ss.    MK is directed to cooperate in the transfer of the permit to any new contractor (including any additional documents or cooperation needed post-transfer) without any cost to MK and at the Purchaser's expense. Such turnover shall occur without any obligation on the part of the Trustee, through either of (a) the specific terms of this Order, Florida Statutes Section 718, or (b) the efforts of the Association.

tt.    In further consideration for the Bar Order, Hyperion is directed to fully and unconditionally release the Guarantors from their guaranties of the Corus loan, provided however, that the release referenced in this paragraph shall not extend to the Guarantors, BAP or any other entity to the extent that they have provided architectural services for the Project, rather the release is limited strictly to the Corus guaranties, and those who have provided architectural services remain liable to the extent of any valid claims.

uu.    In the event that Hyperion is outbid at the Trustee's auction of the Hyperion Units, Hyperion's valid and perfected lien and claim shall be acknowledged by the Trustee and be deemed a finally Allowed Claim, up to the full amount of Hyperion's

Claim, set forth above, and the proceeds from the auction to the third party purchaser shall be forthwith disbursed to Hyperion forthwith subject to the provisions above regarding surcharge rights. Nothing contained in this Order shall entitle the Trustee to hold back any of the proceeds for any section 506(c) claim, however, Hyperion shall remain liable for such claims, subject to its objection rights.

vv.    Except to the extent otherwise provided for elsewhere in this Order, to the extent that Hyperion is not the successful Purchaser, Hyperion shall nevertheless still be released from any and all claims as set forth herein pursuant to the Bar Order, and shall have no further obligations under this Agreement, except to the extent, if any, that the surcharge referenced above is approved by this Court, and subject to Hyperion's indemnification of the Trustee and his professionals as provided for herein.

ww.    Within 15 days following the transfer of title to the Hyperion Units, the Purchaser will immediately commence undertakings to obtain the TCO at the earliest practicable date and that within 60-90 days following the transfer of title to the Hyperion Units, the Purchaser will commence work to facilitate the earliest possible acquisition of the final CO for the Project. The Court will retain jurisdiction to enforce the Purchaser's obligations hereunder and the Association will cooperate with the Purchaser and monitor its progress.

xx.    Upon the entry of this Order and if Hyperion is the successful Purchaser, within 7 days of the conclusion of the closing on the Hyperion Units, the Removed Actions which implicate in any manner Hyperion, including without limitation Circuit Court Case No. 08-78621 CA 32, shall be deemed settled and dismissed, with prejudice as to all named parties, pursuant to the Bar Order, and appropriate documents, if required

shall be submitted or filed as may be the case.

yy.    Upon the entry of this Order, such Order shall constitute a full and complete invalidation of the unauthorized, unsolicited and unaccepted quit claim deed of 33 Hyperion Units to Hyperion, dated December 19, 2008 and recorded at OR Book 27119, Pages 1027-1028, and Hyperion may either file this Agreement in the land records, or may submit a simple Order in appropriate form which this Court will enter to be filed in the land records so invalidating the deed.

zz.    The Association is directed to fully cooperate to make any reasonable and necessary amendments to the Condominium Documents as requested by the Purchaser.

aaa.    To the extent that the Trustee may be asked and/or required to make any management decisions during the interim period prior to the sale of the subject Property and/or prior to the "turnover" of the management and operations of the Association to the non-developer unit owners, any such decisions made will have been done strictly as an accommodation to the parties both herein and in the related Chapter 11 case of the Association and the Trustee shall have no liability therefore except in the case of fraud, gross negligence or willful misconduct.

bbb.    The Purchaser shall indemnify and hold harmless the Trustee and his Professionals for costs of defense in respect of claims that arise or are asserted in respect of any issues arising from the commencement of this case until entry of the final order approving the sale of the Hyperion Units to the Purchaser, and thereafter for any actions taken by the Purchaser, not to exceed $100,000. Subject to the Rules Regulating the Florida Bar, the law firm of Akerman Senterfitt will be and is the Trustee's counsel for purposes of such defense subject to the conditions contained herein. This indemnification

{M2956484;3}

shall expressly exclude claims based upon actions taken by the Trustee or his Professionals through fraud, willful misconduct or gross negligence. This Court will shall retain sole and exclusive jurisdiction to enforce this provision of this Order, including the Bar Order and the Releases.

ccc.    Akerman Senterfitt shall look exclusively to the Purchaser for payment of its fees and costs in connection with this indemnification, up to the sum of $100,000. Akerman Senterfitt shall obtain any assurances it deems appropriate to secure from the Purchaser payment of the $100,000 of its fees and costs directly from the Purchaser. If an unavoidable conflict and /or other matter prevents the Trustees representation by Akerman Senterfitt, then the Purchaser and/or its assigns shall post $100,000 with substituted counsel in trust and this Court shall retain jurisdiction to enforce the provisions of this paragraph and the immediately preceding paragraph in respect of the indemnification.

ddd.    In connection with the indemnification provided for herein, any party in interest seeking to make a claim against the Trustee or his Professionals shall be required to assert such claim by no later than 6 months following the entry of this Order, and with respect to any claims arising from the actions of the Purchaser subsequent to its acquisition of the Hyperion Units, within 6 months of the facts giving rise to such claims. This Court shall have sole and exclusive jurisdiction to hear and adjudicate any such claims under this provision.

eee.    Upon full execution of this Agreement, Hyperion, through the date of the transfer of title to the Hyperion Units to the Purchaser, shall be responsible for funding the Association shortfalls, to the same extent that as it has during the course of this case,

provided that all such funding shall be subject to the assessment set off provisions, in full. Following the date of transfer of title to the units to the Purchaser, all shortfalls of the Association shall be the responsibility of the Association.

fff.    For purposes of clarification with respect to the Bar Order:

(i)  Third Parties (for all purposes in this Bar Order defined as any "person" or "entity" as further defined in §101 of the Bankruptcy Code), as well as any and all guarantors of the Corus mortgage obligation and the Association, are subject of the channeling injunction so that any request, claim, or cause of action against MK, Hyperion, the Purchaser or the Trustee as set forth below shall flow only into the estates of the Debtor or the Association, as may be the case and they are hereby permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any request, claim, or cause of action against MK, Hyperion, the Purchaser, the Association or the Trustee based upon, relating to, or arising out of the facts, conduct, transactions, transfers and circumstances related to the Project, including those claims set forth in the Removed Actions; In addition, the Bar Order extends to all claims that could be raised against the Purchaser for work performed in furtherance of the acquisition of the TCO and CO, excluding actions undertaken through fraud, willful misconduct or gross negligence.

(ii)  In addition to the Bar Order contained herein, the claims and causes of action being released hereunder constitute the exclusive property of the Estate, the Trustee, the Association and Hyperion and such parties have the sole and exclusive standing to seek recovery on account such claims;

(iii)  All parties in interest of the Debtor's bankruptcy estate and the Association's bankruptcy estate and all other parties in interest including, but not limited to contingent creditors, unit owners, persons who have filed claims against the Estates and all persons sued or to be sued by the Estates are hereby permanently barred, enjoined, and restrained from commencing, prosecuting, or asserting any action or proceeding against MK, Hyperion, the Association, the Purchaser and/or the Trustee based in whole or in part on the facts, circumstances, transactions, conduct or claims related to the Project or the Corus loan, including those claims set forth in the Removed Actions, specifically, but without limitation, including any successor developer claims.

(iv)  The Court finds that the Agreement is fair and reasonable and

constitutes sufficient consideration to the Trustee, the Estates and their creditors and parties-in-interest and justifies the imposition of the Bar Order. More specifically, and without limitation, the Court finds that there exists good, valuable and sufficient consideration for the Bar Order, both as to the Debtor's Estate and the Association's Estate, including, without limitation, the obligation of the Purchaser to immediately commence the payment of the assessments of the Hyperion Units (upon taking title), the funding of the Association as set forth above, as well as the commitment of the Purchaser to assist in the completion of the Project so as to obtain a TCO and a final CO at the earliest practicable date.

(v)   The Court finds that good and sufficient notice has been provided to all known persons and entities that may be reasonably impacted by the provisions of this Order.

(vi)  The Bar Order and the other protections contained in this Order and the enforceability of the Bar Order shall survive any dismissal of this case.

ggg.    In the event that the Trustee determines that other parties-in-interest who have not been served with the Motion or this Order should be subject to the terms and conditions of this Order, then the Trustee is authorized and directed to serve a copy of this Order on that interested party and file with the Court an appropriate certificate of service. Any such party who was not originally served with the Motion or this Order, but who is later served with the Order as contemplated herein, shall have 20 days from the service of this Order to seek reconsideration in this Court, failing which, then that party who is served with this Order shall also be bound by the terms and conditions of this Order. In the event a motion for reconsideration is timely filed and the Court enters relief on that motion, then such relief will not affect such other persons previously served with this Order who did not object or otherwise seek reconsideration.

hhh.    Notwithstanding anything in this Order or the Settlement Agreement (D.E. 91) to the contrary, any person or entity who is the subject of future litigation has and retains all defenses to liability or damages and any release, injunction or bar order herein or therein does

not prejudice or affect any defenses held by such person or entity, but the release, injunction or bar order expressly releases and bars all counterclaims related to the project.

        iii.    This Court retains sole and exclusive jurisdiction to interpret and enforce any and all provisions of the Agreement and this Order.

        jjj.    A copy of this Order shall be filed in and be binding upon the Association case as well.

#    #    #

Copy to:

James H. Fierberg, Esq.
Florida Bar No. 0050970
Akerman Senterfitt
One Southeast Third Avenue
25th Floor
Miami, Florida 3331
Telephone: (305) 374-5600
Fax: (305) 374-5095
E-Mail: james.fierberg@akerman.com

Attorney Fierberg is directed to serve a copy of this Order in accordance with the rules of this Court.